**George ANTHONY et al., Plaintiffs,**

**v.**

**Jack D. WHITE et al., Defendants.**

**Civ. A. No. 4699.**

United States District Court,
D. Delaware.

May 17, 1974.

William C. Anderson, Community Legal Aid Society, Wilmington, Del., for plaintiffs.

Richard S. Gebelein, Deputy Atty. Gen., Wilmington, Del., for defendants.

## OPINION

STAPLETON, District Judge:

George and Penny Anthony, husband and wife who reside in Wilmington, Delaware, have brought this action for damages against Patricia Dickey, a social worker formerly employed by the Division of Social Services of the State of Delaware.[1] The Anthonys allege that "willfully, knowingly and intentionally" Mrs. Dickey caused them to be illegally arrested, detained and imprisoned. Characterizing their claims as ones for "false arrest," "false imprisonment" and "malicious prosecution," they assert a deprivation of their constitutional rights, cognizable under 42 U.S.C. § 1983, as well as a right to recovery under the tort law of the State of Delaware. The doctrine of pendent jurisdiction is invoked to bring this latter claim properly before this Court. Armed with her own and her superior's affidavit, Mrs. Dickey now moves for summary judgment.

This suit is an outgrowth of a dispute over custody of the Anthonys' three young children which came to a head in June of 1973. For some time prior to that month, the Protective Services Unit of the Division of Social Services had been consulting with the Anthony family in an endeavor to resolve the family's domestic problems. Mrs. Dickey was the social worker assigned to this task. At some point in late June, the Anthonys received the aid of the Gospel Light

---

1. The Anthonys' complaint named as defendants Jack White, Secretary of the Delaware Department of Health and Social Services and Zola Davis, Mrs. Dickey's supervisor. The Anthonys no longer seek recovery from these defendants. They have also abandoned their original claim for injunctive relief.

Tabernacle Church of Elsmere, Delaware, in caring for their children. On June 22, 1973, the children were in the charge of a Mrs. Balko, a member of the Church.

At 2:00 P.M. on June 22, Mrs. Dickey visited the Anthonys at their home. The events of that afternoon are narrated by Mrs. Dickey's affidavit and the Anthonys do not take issue with her account. Mrs. Dickey expressed concern to Mrs. Anthony about whether Mrs. Anthony and the children were receiving adequate medical attention. Mrs. Anthony responded that she wanted possession of her children. Mrs. Dickey suggested that she lacked the physical and emotional strength to care for the children and recommended that she seek medical advice. Mr. Anthony then appeared and advised his wife to "get ready" since he planned "to pick up the children right away and leave the state." Mrs. Dickey indicated that if the Anthonys were considering this course she would be forced to go to the Family Court and request immediate custody of the children.

Mrs. Dickey returned to the Division of Social Services to discuss the threatened flight of the Anthonys with her supervisor, Mrs. Zola Davis. As Mrs. Davis' affidavit confirms, she advised Mrs. Dickey to immediately seek emergency custody of the Anthony children from the Family Court. Mrs. Dickey thereupon made a telephone call to a judge of the Family Court. On the basis of the facts related by Mrs. Dickey during their conversation, the judge issued an emergency custody order. The order recited the facts upon which the court relied in deciding the matter and concluded as follows:

IT IS ORDERED BY THE COURT as follows: That the custody of the Anthony children . . . is awarded temporarily to the Division of Social Services and the children shall not be removed from New Castle County and their parents are especially enjoined from removing them from their present placement.[2]

Later in the afternoon, Mrs. Dickey went personally to the Family Court where she attempted to reach the Anthonys by telephone and inform them of the court's order. She succeeded only in contacting the Balko's seventeen year old daughter, who was babysitting for the Anthony children. Mrs. Dickey informed her of the custody order and, toward the close of the conversation, was told that the Anthonys were "at the door" and that an "altercation might arise." Mrs. Dickey directed the Balko's daughter "not to be upset and to avoid any confrontation with the Anthonys," and indicated that she "would attempt to reach the police." The police were called and the judge talked to them.

Mrs. Dickey then asked the judge to advise her of the proper course to take in the event the Anthonys removed the children before the police arrived to inform them of the custody order. The judge responded that she should charge the parents with abduction in the Magistrate's Court. Later, that afternoon, Mrs. Dickey discovered that Mr. and Mrs. Anthony had in fact retrieved two of their three children. She thereupon signed a complaint against the Anthonys for child abduction. In pertinent part, that complaint recites that Mr. and Mrs. Anthony "did . . . unlawfully COMMIT THE ACT OF CHILD ABDUCTION to-wit: did then and there remove Dolores Anthony, age two years, and Maria Anthony, age four years, from legally appointed guardians without permission of court." On the basis of this complaint, an arrest warrant was issued by a Justice of the Peace.

The Anthonys' complaint alleges, and Mrs. Dickey does not dispute, that pursuant to this warrant Mrs. Anthony was arrested by a Delaware state trooper, detained for four hours for interrogation and other police procedures and released after posting a $500 bail bond.

2. The Anthonys do not challenge the legality of this order.

Mr. Anthony, according to the complaint, surrendered to the police voluntarily and, after undergoing interrogation and other procedures, was released on his own recognizance. At the request of the Division of Social Services, the charges against the Anthonys were subsequently dismissed pursuant to an order issued by the Family Court.

In her affidavit, Mrs. Dickey states that her sole purpose in charging the Anthonys with abduction was "to seek return of the children before their expressed threat to leave the state had been carried out." She further states that it was never her intention "to punish, harass or persecute the Anthonys" and that she acted "with the sole intention of providing the Anthony children with the protection I felt they needed."

The Anthonys were arrested for allegedly violating Section 624 of Title 11 of the Delaware Code, which provides as follows:

Whoever, without the color of right, forcibly abducts, takes or conveys away any child under the age of 12 years, from the home or usual place of abode of such child, or from the custody and control of the parent or lawful guardian of such child; or

Whoever, without the color of right, and against the consent of the parent or lawful guardian of such child, persuades or entices from the usual place of abode or house of such child, or from the custody and control of the parent or guardian of such child; or

Whoever knowingly secretes or harbors such child, with the intent to deprive such parent or guardian, or any person who may be in lawful possession of such child, of the custody, care and control of such child—

Shall be fined not more than $500, or imprisoned not more than 10 years, or both.

The Anthonys observe that the respective subsections of this statute require

that the alleged abductors act either "without the color of right" or "knowingly." From this language they infer that a necessary element of the crime defined by Section 624 is knowledge on the part of the alleged abductors that they lack lawful custody over the children that they are accused of abducting. Mrs. Dickey, they claim, was fully aware that the Anthonys had not been apprised of the Family Court's custody order when they retrieved their children from the Balko household. Hence, they conclude, Mrs. Dickey lacked probable cause to suspect the Anthonys of child abduction when she secured the warrant for their arrest. Additionally, they maintain that Mrs. Dickey's conceded purpose of "seek(ing) the return of the children before their threat to leave the state had been carried out," while perhaps well-intentioned, was nevertheless an improper motive for securing an arrest warrant.

Consideration of the Anthonys' argument must begin with the observation that Mrs. Dickey neither arrested the Anthonys herself nor made the formal determination that there was an adequate legal foundation for that arrest. Mrs. Anthony was arrested by a Delaware state trooper, while Mr. Anthony surrendered to the police voluntarily. The determination that probable cause existed to arrest the Anthonys was made by the magistrate who signed the warrant for their arrest. Mrs. Dickey's participation in these events was limited to appearing before that magistrate and averring facts concededly true and purportedly indicative of the Anthonys' criminal conduct.[3] Thus, she essentially acted as a complainant, whose affidavit to a judicial officer serves to trigger criminal proceedings.

At common law, a complainant who initiates unfounded criminal proceedings is potentially liable only for the tort of malicious prosecution. Distinguishing actions for false arrest and imprisonment from actions for malicious

---

3. It is to be noted that Mrs. Dickey's complaint did not indicate or suggest in any way that the Anthonys had knowledge of the custody order.

prosecution, Professor Prosser has written that:

> The distinction between the two lies in the existence of valid legal authority for the restraint imposed. If the defendant complies with the formal requirements of the law, as by swearing out a valid warrant, so that the arrest of the plaintiff is legally authorized, the court and its officers are not his agents to make the arrest, and their acts are those of the law and the state, and not to be imputed to him. He is, therefore, liable, if at all, only for a misuse of legal process to effect a valid arrest for an improper purpose. The action must be for malicious prosecution.

Prosser, Law of Torts, p. 62. Since she complied with the proper legal formalities and played no role in the actual arrest and detention of the Anthonys, Mrs. Dickey's liability at common law, if any, must rest on a theory of malicious prosecution. The law of malicious prosecution likewise provides the controlling legal framework for determining her liability under Section 1983 as well.

▮▮▮ Conduct which gives rise to a cause of action for malicious prosecution may also constitute a violation of Section 1983 if that conduct is undertaken under color of state law and results in a deprivation of a federally secured right. See Nesmith v. Alford, 318 F.2d 110, 126 (5th Cir. 1963). In passing upon a claim brought under Section 1983, however, the Third Circuit has cautioned that "the § 1983 right of action should not be construed to be in derogation of the common law." Johnson v. Alldredge, 488 F.2d 820 (1973). Relying on this principle, that court has held, for example, that "officials immune from damage suits at common law would also be immune from such suits under Section 1983." *Id.* And, aside from the immunity from suit available to state officers acting within the scope of their official discretion, other defenses, likewise derived from the common law, are also available in Section 1983 suits. In Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1966), the Supreme Court reiterated that Section 1983 "should be read against the background of tort liability" and accordingly permitted police officers, sued under Section 1983 for committing an unconstitutional arrest, to invoke the defense of "good faith and probable cause" traditionally claimed by police officers in a common law action for false arrest. The Supreme Court's reliance on the common law in *Pierson*, as well as the similar approach of this circuit in *Johnson*, suggests that wherever common law tort doctrine would afford protection from liability, similar protection must be available in analogous actions brought under Section 1983.

▮▮▮ We turn, therefore, to the law of malicious prosecution to determine not only Mrs. Dickey's liability under state tort law but her liability under Section 1983 as well. Traditionally, liability for malicious prosecution will not be imposed if the defendant initiated criminal proceedings either with probable cause to believe that the plaintiff was guilty or for the primary purpose of bringing an offender to justice.[4] Pros-

4. While common law tort principles determine which defenses are available in Section 1983 actions, the controlling body of common law doctrine is not necessarily that of the forum state but rather common law doctrine generally or what the Supreme Court has termed "the prevailing view (of tort law) in this country." Pierson v. Ray, *supra*, 386 U.S. at 555. *Cf.* Whirl v. Kern, 407 F.2d 781 (5th Cir. 1969); Martin v. Duffie, 463 F.2d 464, 467–468 (10th Cir. 1972); Madison v. Manter, 441 F.2d 537, 538 (1st Cir. 1971). Thus, Mrs. Dickey's defenses against the Anthonys' Section 1983 claim and her defenses against their state law claim might conceivably differ if the Delaware law of malicious prosecution diverged from the law of malicious prosecution prevailing generally. However, the few relevant Delaware cases faithfully parallel the principles articulated in the Restatement of Torts. For instance, Delaware has accepted the traditional doctrine that liability for malicious prosecution will not be imposed unless the prosecution in question was instituted both with malice and without probable cause. Stidham v. Dia-

ser, Law of Torts, § 113, p. 853; Restatement of the Law of Torts, § 653, p. 382; Nesmith v. Alford, 318 F.2d 110, 121 (5th Cir. 1963). Because either probable cause or a legitimate law enforcement objective will suffice to defeat an action for malicious prosecution, the standard for recovery in such actions is more stringent than in the kindred area of false arrest, where the defendant police officer must show both good faith *and* probable cause in order to prevail. See Pierson v. Ray, *supra*; Bivens v. Six Unknown Agents, 456 F.2d 1339, 1347–1348 (2nd Cir. 1972). As Professor Prosser has observed, a more rigorous standard of liability is appropriate in an action for malicious prosecution because the defendant "has proceeded under the proper legal formalities." Prosser, *supra*, p. 853. A complainant who swears out an arrest warrant before a magistrate entrusts that magistrate with the task of evaluating the legal sufficiency of the charges he has brought; assuming his motive is proper, the complainant should not be penalized for subsequently disclosed errors in legal judgment. Similarly, even if the complainant has acted in bad faith, the goal of "efficient enforcement of the criminal laws" requires that he be free from liability when he has commenced criminal proceedings in a reasonable ånd justifiable belief that the alleged wrongdoer is guilty. See Restatement, Law of Torts, Introductory Note, p. 380.

■ In the present case, it is unnecessary to examine Mrs. Dickey's motivation for signing the warrant for the Anthonys' arrest since it is clear that she acted with probable cause, as the law of

malicious prosecution has traditionally defined that concept.

Section 662 of the Restatement of Torts provides that:

One who initiates criminal proceedings against another has probable cause for so doing if he

(a) reasonably believes that the person accused has acted or failed to act in a particular manner, and

(b) \* \* \*

(i) correctly believes that such acts or omissions constitute at common law or under an existing statute the offense charged against the accused, or

(ii) mistakenly so believes in reliance on the advice of counsel under the conditions stated in 666.

Enlarging on Section 662(b)(ii), Section 666 provides:

(1) The advice of an attorney at law admitted to practice and practicing in the state in which the proceedings are brought, whom the client has no reason to believe to be interested, is conclusive of the existence of probable cause for initiating criminal proceedings in reliance upon the advice if it is

(a) sought in good faith, and

(b) given after a full disclosure of the facts within the accusers knowledge and information.[5]

Mrs. Dickey's affidavit indicates that the following events occurred when she went to the Family Court to obtain the emergency custody order for the Anthony children:

While at Family Court, I again tried to reach the Balkos to inform

mond State Brewery, 41 Del. 330, 21 A.2d 283 (1941); Brown v. Cluley, 179 A.2d 93 (Del.Super.1962).

5. The Delaware rule is substantially identical. In Plummer v. Collins, 1 Boyce 281, 77 A. 750 (Del.Super.1910), the court charged the jury as follows:

If a person consults a regular attorney about a matter affecting a third person, he ought to use that care in acquiring the

facts and presenting them to counsel, which men of ordinary prudence would ordinarily use in matters of like importance. If he does this, and in good faith lays such facts before his counsel, and then acts upon the advice of his counsel, it would constitute probable cause, and a complete defense to an action of this character.

See also Brown v. Cluley, 179 A.2d 93 (Del. Super.1962).

them of the Court's order. Mr. and Mrs. Balko were not at home. Their seventeen year old daughter was babysitting. I informed her that the Division had custody of the children. She told me that the Anthonys were at the door at that time and expressed fear that an altercation might arise between her and the Anthonys. I told her not to be upset and to avoid any confrontation with the Anthonys and that I would attempt to reach the police. The police were called and [the] Judge . . . spoke to them.

Following the conversation with the police, I asked the Judge . . . what I should do if the Anthonys took the children prior to the time the police arrived to inform them of the Court's order. [The] Judge . . . told me that if that in fact occurred, I should go to Magistrate's Court and charge the parents with abduction.

I take judicial notice of the fact that the judge with whom Mrs. Dickey conferred is a Judge of the Family Court of the State of Delaware as well as a member of the Bar of this State. The advice that the judge gave Mrs. Dickey satisfies the criteria of Section 666 of the Restatement. First, Mrs. Dickey had no reason to suspect the judge of bias against the Anthonys; indeed, if anything, his judicial role would seem to provide compelling assurance that he was disinterested. Second, Mrs. Dickey clearly sought the judge's advice in a spirit of good faith. Her trip to Family Court to obtain the custody order, her consultation with her superior earlier in the day, her effort to apprise the Anthonys and the Balkos of the custody order's existence and her presence while the judge telephoned the police all reflect a diligent effort to seek reliable guidance for her behavior in a delicate and potentially explosive situation. Finally, and most important, the judge's counsel to Mrs. Dickey was based on the exact set of facts on which the Anthonys now rely in alleging that their arrest was unconstitutional. Her request for advice expressly supposed that the Anthonys "took the children *prior to the time the police arrived to inform them of the court's order.*" (Emphasis added). The judge's advice was thus "given after a full disclosure of the facts within (Mrs. Dickey's) knowledge and information."

■ F.R.C.P. 56(e) permits the submission on motions for summary judgment of affidavits "made on personal knowledge." It further provides that "when a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations of his pleading, but his response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." The Anthonys have not disputed, by affidavit or otherwise, the accuracy of Mrs. Dickey's account of the events leading up to their arrest. Nor have they filed an affidivit, pursuant to F.R.C.P. 56(f), representing that they are not presently in a position to rebut Mrs. Dickey's affidavit. Following oral argument, the Anthonys were given a further opportunity to supplement the record. Nevertheless, the defendant's affidavits remain uncontroverted. Under these circumstances, summary judgment is appropriate.

In sum, Mrs. Dickey filed her complaint against the Anthonys in reliance on the advice of a judge, she sought his advice in good faith, the judge was disinterested and his advice was given after full disclosure of the facts within Mrs. Dickey's knowledge and information. It follows that Mrs. Dickey had probable cause to believe that the Anthonys were guilty of criminal conduct.[6]

Mrs. Dickey's motion for summary judgment will be granted.

Submit order.

---

**6.** Since Mrs. Dickey's showing of probable cause is sufficient to warrant summary judgment in her favor on both the Section 1983 and the state law claims against her, it is unnecessary to consider whether her purpose in initiating criminal proceedings against the Anthonys was proper or improper.